UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

CLIFF THOMAS,                        )  Case 1:16-cv-01581
                                     )
                Plaintiff,           )
                                     )
       v.                            )  Alexandria, Virginia
                                     )  July 14, 2017
RAYMOND ROBERTS, *et al.*,           )  10:56 a.m.
                                     )
                Defendants.          )
_____     )  Pages 1 - 22

TRANSCRIPT OF MOTIONS FOR AWARD OF ATTORNEYS' FEES

BEFORE THE HONORABLE ANTHONY J. TRENGA

UNITED STATES DISTRICT COURT JUDGE

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

1  APPEARANCES:

2  FOR THE PLAINTIFF:

3       J. CATHRYNE WATSON, ESQUIRE
         SWICK & SHAPIRO, PC
4        1101 Fifteenth Street, N.W., Suite 550
         Washington, D.C.  20005
5        (202) 842-0300

6  FOR DEFENDANTS RAYMOND ROBERTS AND THANH QUACH:

7       CHARLES B. WAYNE, ESQUIRE
         DLA PIPER, LLP
8        500 Eighth Street, N.W.
         Washington, D.C.  20004
9        (202) 799-4000

10 FOR DEFENDANTS JOHN THOMAS CURTIS AND DEBRA PARKER
   CURTIS:
11
        ROBERT R. VIETH, ESQUIRE
12       ALEXANDER P.M. BOYD, ESQUIRE
         HIRSCHLER FLEISCHER, PC
13       8270 Greensboro Drive, Suite 700
         Tysons Corner, Virginia  22102
14       (703) 584-8900

15 FOR DEFENDANTS ZACHARY CASAGRANDE AND GENA CASAGRANDE:

16       DAVID C. GUTKOWSKI, ESQUIRE
         ODIN, FELDMAN & PITTLEMAN, PC
17       1775 Wiehle Avenue, Suite 400
         Reston, Virginia  20190
18       (703) 218-2100

19 FOR DEFENDANTS DONALD BERLIN AND KIMBERLY L. BERLIN:

20       STEVEN M. OSTER, ESQUIRE
         THE OSTER LAW FIRM
21       1850 M Street, N.W., Suite 280
         Washington, D.C.  20036
22       (202) 596-5291

23

24

25

 1            THE CLERK:  Civil Action 1:16-cv-1581, *Cliff*
 2 *Thomas v. Raymond Roberts, et al*.

 3            Will counsel please identify themselves for
 4 the record.

 5            MS. WATSON:  Good morning, Your Honor.
 6 Cathryne Watson for the plaintiff, Cliff Thomas.

 7            THE COURT:  Good morning.

 8            MR. VIETH:  Good morning, Your Honor.  Robert
 9 Vieth of Hirschler Fleischer for the Curtis defendants,
10 and with me is my colleague, Mr. Alex Boyd, of our
11 office.

12            THE COURT:  Welcome.

13            MR. OSTER:  Good morning, Your Honor.  Steven
14 Oster for Donald and Kimberly Berlin, defendants.
15 Thank you, Your Honor, for the privilege of appearing
16 in your court this morning.

17            MR. GUTKOWSKI:  Good morning, Your Honor.
18 David Gutkowski of Odin, Feldman & Pittleman on behalf
19 of Zachary and Gena Casagrande.

20            MR. WAYNE:  Good morning, Your Honor.
21 Charles Wayne on behalf of the Roberts defendants.

22            THE COURT:  Good morning, Mr. Wayne.

23            We're here on a motion for attorneys' fees in
24 connection with the dismissed claims against the
25 dismissed defendants.  I've reviewed the filings.  I'd

1  be pleased to hear from counsel as far as what they

2  don't think they've already adequately explained to the

3  Court.

4          MR. VIETH:  Thank you, Your Honor.  Again,

5  Robert Vieth for the Curtis defendants, Your Honor.

6          We do recognize the standard in this case is

7  a high one.  It's really whether the complaint was

8  frivolous or groundless.  For that reason, these

9  motions are somewhat unusual or perhaps extraordinary.

10  I don't believe I've ever filed one, but this is a case

11  where we think attorneys' fees are warranted.

12          There is really no basis for the claims that

13  were filed against Mr. and Mrs. Curtis and especially,

14  as we've said in our papers, Mrs. Curtis.

15          THE COURT:  Based on what you and the other

16  counsel have provided, is there any way the Court can

17  assess what the incremental cost was of representing

18  the wives as opposed to the husbands?

19          MR. VIETH:  I think that would be difficult,

20  Your Honor, because we did represent both.  The claims

21  were identical as against both.  The factual

22  circumstances were somewhat different.  But candidly,

23  when we were working on the case, we did not separate

24  out -- we were raising the same arguments by and large

25  on behalf of each of those defendants.

1          I actually would submit to Your Honor that

2    even as against Mr. Curtis, this case was groundless

3    and frivolous.  The actions in the complaint were thin

4    to say the least.  I would suggest to the Court that

5    there are at least a couple of circumstances applicable

6    here that don't appear in every dismissed case brought

7    under the civil rights acts that certainly suggest that

8    in Your Honor's discretion -- this is a discretionary

9    call on Your Honor's part of course.  But it suggest

10   that Your Honor should exercise your discretion to at

11   least award some fees here.

12          This is not just a stand-alone lawsuit

13   really.  It was an outgrowth of proceedings that

14   continue to be litigated in Loudon County Circuit

15   Court.  It was really multiplication of legal

16   proceedings that, in this case, was, I think,

17   unwarranted.  These claims or similar claims could have

18   been raised in Loudoun County.  By the way, that case

19   was referred to in the complaint, and the complaint

20   even acknowledged the defendants here, the defendants'

21   success in that case there.

22          THE COURT:  What do you say to the notion

23   which I see not explicitly stated, pretty much infused

24   into the plaintiff's position that this case really

25   should be considered within the context of the notion

1  that based on all the facts and circumstances, this was

2  a good faith effort to expand the law based on -- to

3  extend to a claim that a racially motivated lawsuit,

4  albeit one that proved successful at least up to this

5  point, is actionable under 1981 if not some of these

6  other claims?

7      MR. VIETH:  I didn't quite understand the

8  plaintiff to be making the argument quite the way Your

9  Honor framed it, but I think that argument at the end

10  is not sufficient to overcome the claim for attorneys'

11  fees here.

12      The Third Circuit spoke to, I think, this

13  very issue in the *Barnes Foundation* case that we've

14  cited in the papers where the court in 2001 essentially

15  issued a warning to plaintiffs who were filing lawsuits

16  like this against defendants for the defendants

17  exercising their First Amendment rights by filing a

18  lawsuit or by petitioning government officials.  The

19  Third Circuit made it clear that while the law up to

20  that point may have been somewhat mucky, from this

21  point on, every plaintiff like this is on notice that

22  they're doing this at their peril, in the words of the

23  court, because it is clear that this is an attempt to

24  chill the First Amendment rights of the defendants.

25  That is the second circumstance that I think really

1  makes this case one that is appropriate for some sort

2  of deterrent.

3          This type of case is -- well, the claims in

4  this case, Your Honor, are serious ones.  No person

5  likes to be accused of engaging in racial animosity or

6  racially motivated conduct.  That's the allegation that

7  was made in this case, and there was simply no basis

8  for it.

9          When it is, in fact, an effort to chill or

10  would have the effect of chilling First Amendment

11  rights that the defendants had, it is all the more

12  egregious, Your Honor.  Frankly, it tends to trivialize

13  what can sometimes be in some cases, not this one, but

14  in other cases serious racially motivated conduct.

15  There was just zero evidence of that here.  Even the

16  allegations on the face of the complaint were

17  insufficient to move forward.

18          I'm sure Your Honor takes no pleasure in

19  going through legal bills and the like.  The good news

20  here is there seems to be no challenge as to rates.

21  There seems to be only the most casual challenges to

22  some of the time entries.  We'd be happy to address

23  that if you'd like.

24          I think unless the Court has any questions, I

25  would be happy to rest on that and on our papers.

1          THE COURT:  All right.  Thank you.

2          MR. VIETH:  Thank you.

3          THE COURT:  Counsel.

4          MR. GUTKOWSKI:  Yes, Your Honor.  I have very

5    little to add, frankly.

6          THE COURT:  You're appearing on behalf of?

7          MR. GUTKOWSKI:  The Casagrandes, Your Honor.

8          THE COURT:  The Casagrandes.

9          MR. GUTKOWSKI:  Dr. Casagrande and

10   Mrs. Casagrande.

11         We would adopt the arguments made by

12   Mr. Vieth, and we don't need to belabor the point.

13         If you have any questions about our papers,

14   I'd be happy to answer them.

15         There are two things that I would like to add

16   to Mr. Vieth's argument.  One is not only do we have

17   the face of the complaint, which is thread bare of

18   anything other than conclusory statements related to

19   any sort of discriminatory intent or any actions taken

20   by any of these codefendants, we also now have the

21   benefit of discovery closing.  In the opposition to the

22   instant motions, it was devoid of any evidence

23   supporting any factual allegations made in the

24   complaint.

25         As to Mr. Casagrande or Dr. Casagrande, I

1    should say, as we point out in our papers, there's a

2    very, frankly, reckless allegation made in the

3    complaint that's echoed within the first amended

4    complaint where Dr. Casagrande approached an arborist

5    working on the plaintiff's yard and asked him why he

6    was working for a quote, unquote, black man.  That's in

7    paragraph 20 of the first amended complaint.

8           As Your Honor, I'm sure, read in our

9    submissions, Mr. Thomas was under oath at the Loudon

10   County Court and plainly stated that he has no clue

11   whether or not Dr. Casagrande was that person or if

12   Dr. Casagrande was even there.  He objected to the

13   question on the grounds of hearsay.  I don't mean to

14   make light of it, Your Honor, but it's a fairly

15   remarkable passage that I'm sure Your Honor has

16   reviewed.

17          So even as to the one factual allegation in

18   the complaint that could somehow be tied to some sort

19   of racial animus as to Dr. Casagrande, he's already

20   recanted that.  He's already stated under oath he has

21   no clue whether or not that's true.  Yet, here it is in

22   his complaint as has been echoed in his first amended

23   complaint, Your Honor.

24          Again, regarding our fees, if you have any

25   questions about our fees, I'm happy to answer them or

1 any of our other submissions. Otherwise, Your Honor,

2 I'll also rest on that.

3          THE COURT: All right. Thank you.

4          MR. GUTKOWSKI: Thank you very much, Your

5 Honor.

6          MR. OSTER: Good morning. Steven Oster on

7 behalf of Donald and Kimberly Berlin. Unless Your

8 Honor has some specific questions regarding the

9 Berlins' submission, I'll adopt the arguments of

10 cocounsel and not take up any more of Your Honor's

11 time.

12          THE COURT: All right. Thank you.

13          MR. OSTER: Thank you, Judge.

14          THE COURT: Anyone else?

15     (No response.)

16          THE COURT: All right. Counsel.

17          MS. WATSON: Yes. Thank you, Your Honor.

18          As Your Honor knows, attorneys' fees against

19 a federal civil rights plaintiff is an extreme

20 sanction, and it's a chilling sanction. It's an

21 extraordinary one, and it's not appropriate in this

22 case.

23          As we try to describe in our papers, the

24 state law in litigation is not meant to be repealed.

25 It's not meant to be appealed or relitigated by these

federal civil rights claims, but they are necessarily
relevant facts to the plaintiff's claims.

So what he knew when he filed this complaint
and made these claims was that the defendant's husband
had approached him and his wife, the plaintiff and his
wife, and told him that he wasn't going to be able to
use his property how he wanted.

THE COURT: This is at the Panera meeting,
correct?

MS. WATSON: That's right, Your Honor.

THE COURT: There are no allegations that
there were any racial slurs or statements in the
context of that particular meeting; was there?

MS. WATSON: That's correct, Your Honor.

The Supreme Court has said that racial
discrimination is usually not explicit. It's usually
shown by circumstantial evidence.

The plaintiff's white predecessor on the
property had pursued commercial ventures, such as -- I
believe he talked about a soccer field and a golf
facility. He had implemented an equestrian venture
there. But according to his testimony, he got along
just fine with all the neighbors. But when the black
family moves in, they don't get along fine with him.

THE COURT: I guess they thought he was going

1   to use the property as a vineyard.  Is that right?

2           MS. WATSON:  That seems to be the heart of

3   the defendant's position as far as what the true

4   motivation is.  I will say on, I believe, January 2 the

5   plaintiff sent an e-mail to his neighbors saying that

6   planting grapes was a personal hobby and interest and

7   so not a serious commercial venture plan.  So from the

8   plaintiff's point of view, that doesn't seem to really

9   hold water.  That seems pretextual as far as a reason

10  to go after him so aggressively.

11          If I may, I'd like to draw the Court's

12  attention to the Plaintiff's Exhibit 22 to our

13  opposition to summary judgment filed by Defendant

14  Mr. Roberts.  That's a declaration by Mr. Thomas of an

15  event that happened recently on June 24.

16          The plaintiff held a private gathering, a

17  party, and all of his guests were black.  He observed

18  Mr. Casagrande stopping his guests as they were trying

19  to find his property and later in the evening was

20  advised that the sheriff's office was inundated with

21  complaints of noise and marijuana smoke coming from the

22  plaintiff's property, which was -- there wasn't even

23  alcohol served at this party.  No one even smoked a

24  cigarette.  There certainly wasn't any marijuana

25  smoking, and the deputies advised that there wasn't a

1  noise issue.

2          So I would put forth to you that false

3  complaints of marijuana smoke and unruly behavior from

4  the only black family on the block who has their black

5  guests over is a racially-charged event.

6          THE COURT:  Why would the Court consider that

7  in evaluating whether at the time he filed the lawsuit

8  he had an adequate factual basis?

9          MS. WATSON:  What our position is is that

10  Mr. Thomas was under attack and feeling like he was

11  being run out of his neighborhood.

12          THE COURT:  I understand his feelings about

13  that.  Tell me:  Other than the Panera meeting as to

14  each of these three defendants, what is it that was

15  alleged in -- what was the factual basis for it?  Begin

16  with Casagrande.  I understand that the one allegation

17  that was made against him -- and that is that he said

18  to one of the workmen, Why are you working for a black

19  man -- what was the factual basis for that?

20          MS. WATSON:  Mr. Thomas explained in his

21  deposition testimony that his business partner had

22  relayed to him that the arborist had told her that

23  someone who works under the arborist had relayed to him

24  that Mr. Casagrande had said that, had said, Why are

25  you working for a black man?

1          Mr. Thomas also testified that those

2   contractors who had worked for him had told him that

3   Mr. Roberts, the remaining defendant, was --

4          THE COURT:  Just stick with Casagrande.

5   Other than that statement in the Panera meeting, what

6   was the basis for the claim other than the filing of

7   the lawsuit?

8          MS. WATSON:  Well, his participation in the

9   lawsuit, and plaintiff was advised by developer Jim

10  Brown that Mr. Roberts was the ringleader of the whole

11  neighborhood.  I mean, these neighbors presented as a

12  united front.  They talked about, We are not going to

13  let this happen.

14          They are a united front.  Their version is

15  they're a united front against the winery.  But from

16  the plaintiff's point of view, they're a united front

17  against -- they weren't a united front against

18  Mr. Pomata, the white predecessor, but they are against

19  the plaintiff.

20          THE COURT:  I understand that position.  Just

21  so I'm clear, other than that, anything else on

22  Casagrande?

23          MS. WATSON:  I believe that pretty much sums

24  it up.

25          THE COURT:  What about Berlin?

1          MS. WATSON:  It's similar to what I've just

2 explained about Mr. Casagrande.

3          THE COURT:  All right.  And Curtis, separate

4 from the Panera meeting and the filing of the lawsuit,

5 what was the basis for bringing the claim against him?

6          MS. WATSON:  I believe it is the same as I've

7 described.

8          THE COURT:  All right.

9          MS. WATSON:  Our point is we understand that

10 these defendants have been dismissed on a 12(b)(6)

11 motion, but from what the plaintiff knew when he filed

12 the lawsuit --

13          And I would say also from some of what's been

14 learned in discovery as far as -- you know, the

15 Thomases were completely intimidated and scared by that

16 meeting at Panera.  They felt ambushed and got a clear

17 message that these households were not going to put up

18 with what they wanted to do with their property.

19          And so my point is we understand these were

20 dismissed, but under these circumstances, the severe

21 and chilling sanction of punishing the plaintiff with

22 attorneys' fees is not warranted.

23          As Your Honor knows, the attorneys' fees

24 award provision of these civil rights statutes is

25 intended to allow private citizens to be private,

1  Attorneys General to maintain the robustness of these

2  civil rights laws, not to punish them when they get

3  their claims dismissed on 12(b)(6).

4          So thank you.

5          THE COURT:  All right.  Any other defendants

6  want to respond?

7          MR. VIETH:  I have nothing further, Your

8  Honor.

9          THE COURT:  All right.  Anyone else?

10          MR. GUTKOWSKI:  No, Your Honor.  We would --

11  I'm sorry.

12          THE COURT:  Come to the podium, please.

13          MR. GUTKOWSKI:  To the extent that Your

14  Honor -- and based upon your comments, I don't believe

15  you do.  But to the extent Your Honor lends any

16  credence to the declaration or the notion as to what

17  recently occurred on the property, there are several

18  photographs that I reviewed yesterday that show that

19  the declaration submitted by Mr. Thomas doesn't carry

20  any water in that respect, that this was a large

21  function.  There was drinking.  There was smoking,

22  etc., etc., etc.  So to the extent that Your Honor in

23  any way is moved by that argument, I'm happy to submit

24  those things.  Otherwise, I have nothing further, Your

25  Honor.

1          THE COURT:  All right.  Counsel, do you have

2    anything further?

3          MR. OSTER:  Your Honor, I only have one brief

4    point with respect to the Berlins, and I think it also

5    applies to the Curtises and the Casagrandes.  There was

6    not a shred of evidence, not any evidence that

7    Mr. Berlin or his wife -- clearly his wife -- had ever

8    done, said, or participated in anything of a racial

9    nature.

10         The Panera meeting is noteworthy not for what

11   the people disagree about, but it's noteworthy for what

12   Mr. Thomas, his wife, and the defendants all agree.

13   They were concerned that there not be commercial

14   activity on the property.

15         Now, it's true that Mr. Pomata, the former

16   owner, did have his son's wedding there.  But to try to

17   compare that to --

18         THE COURT:  Well, the allegation was, as I

19   recall, using it for other commercial purposes.

20         MR. OSTER:  There was an allegation that he

21   had considered using it for other commercial purposes

22   but not that he had.

23         THE COURT:  I see.

24         MR. OSTER:  At the end of the day, the

25   parties agree that what was discussed at the meeting

was a desire not to have commercial activity on the
property, which is perfectly reasonable.  Whether it's
right or wrong is irrelevant, but it's perfectly
reasonable.

          The entire defense, as I understand, to
attorneys' fees is, Well, we really thought -- we
thought that we were being treated differently because
of our race.  I think the Fourth Circuit's decision in
*Lotz* makes clear that that's insufficient.

          THE COURT:  All right.

          MR. OSTER:  Thank you, Judge.

          THE COURT:  Plaintiff's counsel, let me ask
you a question about this.  What is the evidence and
the allegations as far as the previous owner's actual
commercial use of the property?

          MS. WATSON:  I believe it's -- well, as far
as the complaint, we did take a deposition of
Mr. Pomata, and he testified to having considered
commercial ventures.

          THE COURT:  I understand.  Was it ever
actually used for commercial pursuits?

          MS. WATSON:  I believe he used it for an
equestrian commercial venture on part of the property.
I believe he used it for equestrian purposes.  The
remaining defendant has testified he didn't have as

much of a problem with that pursuit versus a vineyard.

If I may, I would just like to reiterate not wanting a vineyard next door is arguably a legitimate reason. But the plaintiffs had tried to ease his neighbor's fears about some big commercial vineyard via e-mail by saying that was a hobby and he didn't have a particular -- he didn't have a specific plan for that.

You know, this is -- that is a dispute. There are two perspectives on that. I don't think that that makes -- I don't think that that justifies calling his claims groundless or baseless or warranting a sanction.

THE COURT: I'll go back and read the complaint, but I thought there was an actual allegation that the previous owner had, in fact, used it for commercial properties, which is what caused the plaintiff to think that he was being treated differently than the previous owner.

MS. WATSON: I think you're right, Your Honor. I think he used it for an equestrian commercial venture.

THE COURT: What was the basis for that belief? Was that, in fact, borne out by discovery?

MS. WATSON: No. I believe the plaintiff was advised that by another witness, but I apologize. I

1  don't know exactly who.

2          THE COURT:  All right.

3          MR. WAYNE:  Your Honor, it is not my motion,

4  but may I be heard?

5          THE COURT:  Yes, Mr. Wayne.

6          MR. WAYNE:  So, Your Honor, with regard to

7  the prior commercial use -- so there are 12 lots.

8  Everybody who bought a lot was told that there was a

9  prior existing use on Lot 3 which was the equestrian

10  center.

11          THE COURT:  That's the plaintiff's current

12  property?

13          MR. WAYNE:  No, it is not.

14          Anyway, the equestrian center was primarily

15  on Lot 3.  The horses were allowed to run onto Lot 4A.

16  That was a prior existing commercial use that when all

17  the defendants -- when they all bought it, when

18  everybody bought, it was said, This is part of the

19  deal.  There was no issue about whether there was an

20  existing homeowners association with covenants, but

21  that was part of the deal.  The equestrian center was

22  there and was grandfathered in.

23          After my client bought his property and

24  Mr. Pomata was marketing his property -- that's the

25  property Mr. Thomas eventually bought.

1          THE COURT:  What lot number is that?

2          MR. WAYNE:  That would be 4A.

3          THE COURT:  Lot 4A.

4          MR. WAYNE:  So Lot 4A when it was being

5  marketed --

6          THE COURT:  The plaintiff's property?

7          MR. WAYNE:  Correct.

8          -- by Mr. Pomata, he was entertaining offers

9  from individuals who wanted to build a soccer training

10 facility and wanted to build a golf academy.  This is

11 in the spring of 2015.  So those proposed sales were

12 met with strong resistance by my client and the other

13 defendants.

14          They were urging Mr. Pomata, A, not to do

15 that, to sell to commercial use, number one; number

16 two, petitioning the Loudoun County Board of

17 Supervisors and the zoning people that the property

18 should not be -- they were against the use of Lot 4A as

19 a soccer academy or a golf academy.  So this all

20 happened long before Mr. Thomas bought Lot 4A.

21          THE COURT:  All right.

22          MR. WAYNE:  We're talking about disparate

23 treatment here.  The notion that Mr. Pomata was treated

24 differently by the defendants than Mr. Thomas simply is

25 not true.  They were against commercial use of Lot 4A

1  when Mr. Pomata was seeking to sell it to commercial

2  buyers.

3          THE COURT:  All right.  Thank you.

4          All right.  I'm going to look at the record

5  in a little more detail and take it under advisement.

6  I'll get you a decision just as soon as I can.

7          All right.  Thank you.

8          MS. WATSON:  Thank you, Your Honor.

9          MR. VIETH:  Thank you, Your Honor.

10         MR. WAYNE:  Thank you, Your Honor.

11         THE COURT:  The Court will stand in recess.

12         -----------------------------------
                   Time:  11:20 a.m.

13

14

15

16

17

18

19

20

21
       I certify that the foregoing is a true and
22
    accurate transcription of my stenographic notes.
23

24
                          _____
                              /s/
25                        Rhonda F. Montgomery, CCR, RPR

       Rhonda F. Montgomery  OCR-USDC/EDVA  (703) 299-4599