1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF VIRGINIA
2               ALEXANDRIA DIVISION

3   CLIFF THOMAS,                 )   Case 1:16-cv-01581
                                  )
4               Plaintiff,        )
                                  )
5        v.                       )   Alexandria, Virginia
                                  )   July 21, 2017
6   RAYMOND ROBERTS, *et al.*,    )   11:04 a.m.
                                  )
7               Defendants.       )
    _____)   Pages 1 - 48
8

9       TRANSCRIPT OF CROSS-MOTIONS FOR SUMMARY JUDGMENT

10         BEFORE THE HONORABLE ANTHONY J. TRENGA

11            UNITED STATES DISTRICT COURT JUDGE

12

APPEARANCES:
13

FOR THE PLAINTIFF:
14
          J. CATHRYNE WATSON, ESQUIRE
15        SWICK & SHAPIRO, PC
          1101 Fifteenth Street, N.W., Suite 550
16        Washington, D.C.  20005
          (202) 842-0300
17

FOR DEFENDANTS RAYMOND ROBERTS AND THANH QUACH:
18
          CHARLES B. WAYNE, ESQUIRE
19        BRIAN J. YOUNG, ESQUIRE
          DLA PIPER, LLP
20        500 Eighth Street, N.W.
          Washington, D.C.  20004
21        (202) 799-4000

22

23

24

25     COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

1          THE CLERK:  Civil Action 1:16-cv-1581, *Cliff*

2   *Thomas v. Raymond Roberts, et al*.

3          Will counsel please identify themselves for

4   the record.

5          MS. WATSON:  Cathryne Watson for the

6   plaintiff.

7          MR. WAYNE:  Good morning, Your Honor.

8   Charles Wayne for the Defendant/Counterclaimant Raymond

9   Roberts, and I'm here with Brian Young.

10          THE COURT:  Welcome to everyone.

11          We're here on cross-motions for summary

12   judgment.  I've reviewed the briefing.  I'd be pleased

13   to hear further from counsel as to what you think you

14   haven't already adequately explained.

15          Counsel for the plaintiffs.

16          MS. WATSON:  For the plaintiffs?

17          THE COURT:  Yes.

18          MS. WATSON:  Thank you, Your Honor.

19          As the movant for summary judgment on the

20   defendants' counterclaim, if it please the Court, I can

21   begin with those points.

22          THE COURT:  Well, I've reviewed the

23   pleadings.  If there's anything you want to emphasize

24   or further explain, I'd be happy to hear you.

25          MS. WATSON:  I believe we did try to cover it

1  thoroughly in the pleadings.  If I may, I'll just

2  briefly enumerate what I believe the claims are based

3  on and why our position is that they don't state a

4  claim for -- or it must be dismissed on summary

5  judgment.

6          Defendants' Exhibit 56 is an e-mail to the

7  plaintiff's attorneys, as well as Rose Osamba and an

8  attorney friend named Mr. Nguyen.  That says, As I told

9  one politician, it's better to be a pedophile in

10 Loudoun County than a black man.

11         Then in the next sentence of that e-mail, he

12 references Tom.

13         THE COURT:  What's the date of that e-mail?

14         MS. WATSON:  That's July 22, 2016.

15         THE COURT:  All right.

16         MS. WATSON:  In the very next sentence, the

17 plaintiff referenced Tom.  In his deposition testimony,

18 he confirmed that's Tom Navarro.  He's saying, Tom can

19 be convicted of sodomizing a 13-year-old kid and can

20 backfill thousands of tons of muck on a flood plain,

21 and Loudoun County does nothing.  I believe that e-mail

22 quite explicitly refers to Tom Navarro and not Raymond

23 Roberts in reference to the alleged defamatory content

24 of that e-mail.

25         Exhibit 57 is a September 22 e-mail to a

1  Loudoun County official, Jeanine Arnett, wherein the

2  plaintiff forwarded an e-mail he had written to his

3  attorney, Larry Anderson.  In the middle of a long

4  e-mail, he said, Or the fact that the defendant has

5  nude pictures of underage children on his camera coming

6  into my yard.

7        As we argued in our pleadings, we believe

8  that, given the information available to the plaintiff

9  at the time, it was neither negligent nor without

10 reasonable or probable grounds for the plaintiff to

11 believe that.

12        We also are of the position that the

13 plaintiff had been, as the record shows, in frequent

14 communication with this Loudoun County official and

15 others raising his concerns about his land use and

16 about his complaints with Raymond Roberts.  Therefore,

17 it's our position that those officials did have an

18 interest in hearing his concerns, including this one.

19 Therefore, it would be protected by qualified

20 privilege.  But even if it weren't, it's our position

21 that it was not negligent for Mr. Thomas to state that

22 it was his belief that those images existed on the

23 camera.

24        Next in time is Defendants' Exhibit 22 [sic],

25 an October 6, 2016, e-mail.  Our position is

essentially the same. The plaintiff forwarded that
same e-mail I referenced a moment ago to other Loudoun
County officials. In the context of that, he's
complaining about not being able to get a meeting with
county officials to address his numerous concerns,
among them the treatment from Raymond Roberts.

Defendants' Exhibit 58 is an October 29
e-mail to Loudoun County officials. In that,
Mr. Thomas said that he believed that the defendant may
be using his camera to peep into his house and that it
was probable he had video of his children. He
requested that the sheriff be sent to advise that he
can't use his camera for peeping or pornography or
inappropriate purposes. So that e-mail doesn't contain
any actual allegations against Raymond Roberts. It
contains a legitimate request for law enforcement
intervention. I don't believe that can be a basis for
defamation.

Finally, Exhibit 59 is an October 31, 2016,
e-mail to the NAACP president, Phil Thompson. The
basis of that being cited is that the plaintiff
forwarded the e-mail I just referenced a moment ago.
Mr. Thompson is a lawyer, and he directed the plaintiff
on how to file a complaint with the NAACP to seek legal
redress. It's our position that this was in the

1   context of plaintiff's racial complaint or racial

2   discrimination complaints against Raymond Roberts,

3   which the NAACP has an interest in.  Furthermore, it is

4   also in the context of seeking legal representation.

5   Perhaps more importantly, there's no actual allegation

6   against the defendant in the e-mail he forwarded.

7   Therefore, it's our position it cannot be a basis for a

8   defamation claim.

9           So that is a summary of our position

10  regarding our motion to dismiss the defamation claim on

11  summary judgment.

12          We've also said in our papers why we believe

13  there are ample issues of material fact, why the

14  plaintiff's claims of racial harassment and stalking

15  should be permitted to go to a jury.

16          THE COURT:  All right.  I'm going to let you

17  respond to that after we hear from the defendants.

18          MS. WATSON:  All right.  Thank you.

19          THE COURT:  Mr. Wayne, I'll give you an

20  opportunity to respond to their motion and advance your

21  own motion.

22          MR. WAYNE:  Thank you, Your Honor.

23          So in Virginia, statements may be defamatory

24  by implication so long as the meaning is plain.  Here

25  we have both explicit and implicit defamatory

1  statements.  In fact, we have conclusive proof of

2  defamation *per se*.

3          They say that Mr. Roberts -- Mr. Thomas says

4  Mr. Roberts committed a criminal offense involving

5  moral turpitude.  You just heard recitation, and Your

6  Honor has the e-mails themselves, four to five e-mails

7  to people who did not request the statements or have a

8  need to see them.

9          Exhibit 56 which reference to being a

10 pedophile doesn't refer to Mr. Roberts is belied by the

11 text of the e-mail.  In fact -- I won't quote all of

12 these e-mails to you but just this one.  As Your Honor

13 has seen, it says, If I was filming a white person's

14 kid and had nude photos of them, you and the rest of

15 the county would have me locked up by now.  But because

16 my kids are of color, no one will do a damn thing.

17 Raymond can have the Loudoun County's Sheriff's

18 Department come to my house and harass me on four

19 different occasions, and no harassment complaint is

20 being filed.  As I told one politician, it's better to

21 be a pedophile in Loudoun County than a black man.

22          THE COURT:  That's the July 22?

23          MR. WAYNE:  Correct, Exhibit 56 in our

24 papers.

25          THE COURT:  All right.

1          MR. WAYNE:  So Mr. Thomas has no evidence to

2   prove the truth of that statement or any of the similar

3   statements in any of the e-mails.

4          This Court on the motion to dismiss, when

5   considering the civil claim based on the federal

6   pornography statute, has called that claim frivolous.

7   That claim is essentially the claim on the flip side of

8   this defamation claim.

9          Moreover, plaintiff argues that Mr. Roberts

10  somehow has the obligation -- although counsel didn't

11  mention this -- to view the thousands of hours of

12  security camera footage and the fact that he hasn't

13  done so shows somehow that there could be truth to

14  these statements.  Of course, Mr. Thomas has the burden

15  of proof.  He has had these thousands of hours of video

16  for months, but no images have been attached as

17  exhibits.  Why not?  Because this security camera in

18  issue is trained on a very narrow patch of ground on a

19  gap between the two gates to their property.

20          Moreover, Mr. Thomas has admitted, to his own

21  negligence and recklessness, to stating that

22  Mr. Roberts was involved in criminal conduct.  At

23  Mr. Thomas' deposition, he was asked the question:  Do

24  you believe that Mr. Roberts purposely took nude videos

25  of your children?

1          And the answer was, I don't really care

2    whether or not he purposely did it or incidentally did

3    it.

4          The statements that he's made are patently

5    false, and the answer to that deposition question shows

6    he acted with the requisite intent.  That is both

7    negligent and reckless.

8          As to the notion of privilege, yes, a

9    qualified privilege would protect the communication

10   from allegations of defamation if made in good faith to

11   a person with a duty or interest in the communication.

12   Moreover, that person must have the authority to give

13   redress.

14          So with regard to each of these e-mails --

15   and I won't go through every one -- they are to

16   people -- even though, yes, one might be to the

17   sheriff, in addition to five or six other people.  One

18   might be to his lawyers.  This is the e-mail we've been

19   talking about of July 22, 2016, Exhibit 56.  That was

20   sent to Jeanine Arnett, the chief of staff for the

21   chairman of the board of Loudoun County supervisors.

22   Again, this is not somebody who had a need to see it or

23   could afford redress.  This is true of every single one

24   of these four e-mails, and there's a fifth which

25   repeats part of one of the earlier four e-mails.

1           The e-mails went, as I said, to Ms. Arnett.
2    They went to Ron Brown, Assistant County Attorney; to
3    the county attorney himself; to another assistant
4    county attorney; to the chairman of the board of
5    supervisors; to two other supervisors; to other staff
6    people.  None of these people are the type of people
7    that would give rise to a qualified privilege as
8    recipients.
9           Moreover, I just heard that the e-mail that
10   went to the head of the local chapter of the NAACP is
11   somehow qualified as privilege because that person
12   happens to be a lawyer.  He is not Mr. Thomas' lawyer,
13   and nothing in that e-mail can remotely be interpreted
14   as a request for legal representation.  In fact, to the
15   contrary, Mr. Thompson, head of the local chapter of
16   the NAACP, effectively says that he can't help
17   Mr. Thomas.
18          THE COURT:  Why wouldn't these e-mails to the
19   county people qualify for a qualified privilege?
20          MR. WAYNE:  Because it's not the business of
21   the board of supervisors to deal with criminal conduct.
22          THE COURT:  But the subject matter was
23   something that they would have an interest in, and it
24   involved one of their constituents.  They would
25   presumably take an interest in that.

1        MR. WAYNE:  I would respectfully disagree

2   with Your Honor.  There is absolutely no authority out

3   there -- and we say this in our brief -- that

4   defamatory statements somehow interspersed with matters

5   which might be of relevance to the recipient are

6   somehow qualified for a privilege.  Yes, this is all

7   bound up, and we'll get to this when we talk about our

8   motion.  This is all bound up in a zoning dispute, a

9   land use dispute.  But under the guise of coming to the

10  county -- and part of it does deal with the land use

11  dispute -- there are these other statements which the

12  chairman of the board of supervisors has no interest

13  in, cannot remedy.  It's not within the board of

14  supervisors or the zoning staff's purview to deal with

15  allegations of criminal conduct, much less child

16  pornography.

17        THE COURT:  All right.  I understand.

18        MR. WAYNE:  Moreover, the qualified

19  privilege, even if one existed, can be defeated by

20  malice.  There is abundant evidence in the record that

21  Mr. Thomas had the requisite malicious intent as to

22  Mr. Roberts.  So for the test, you need personal spite,

23  ill will independent of the communication or knowledge

24  that it's false or reckless disregard of whether it's

25  false.

1        Here the deposition passage I just quoted to

2   Your Honor where Mr. Thomas says -- he admits he

3   doesn't care whether Mr. Roberts incidentally or

4   purposefully possessed these photos.

5        We have Your Honor's own comment at the

6   motion to dismiss hearing where you said this was

7   frivolous.

8        In addition, the security video, again -- and

9   this is uncontested -- it's utterly improbable to

10  impossible that the footage would contain any such

11  images since that security camera is trained on a piece

12  of ground in the gap between the two gates to the two

13  properties.

14       Moreover, ill will and personal spite is

15  shown by Mr. Thomas' own e-mails.  In Exhibit 38, a

16  March 12, 2016, e-mail, he says, Mr. Roberts is capable

17  of causing physical and emotional harm to Mr. Thomas'

18  wife and his children.

19       The very next day he writes an e-mail to his

20  Realtor who says to him, Well, the neighbors sound like

21  a nightmare.

22       He writes back and says, No.  Mr. Roberts and

23  the neighbors are, quote, all bark and not much bite.

24       That's one day to the next.  That shows the

25  ill will and the spite and the malice that Mr. Thomas

1  harbors towards Mr. Roberts.

2         Moreover, we have the comments, as Your Honor

3  has seen, where he calls Mr. Roberts a jackass, a

4  cowardly racist bastard from Canada.  Plus, he refers

5  to Mr. Roberts and his attorney as racist bigots

6  because of the temporary injunction entered by the

7  Loudoun County Circuit Court in connection with the

8  easement lawsuit, the land use lawsuit.

9         So it's clear Mr. Thomas hated and hates

10  Mr. Roberts for opposing Mr. Thomas' planned commercial

11  ventures on his property.  So he fabricated and

12  publicized false allegations that Mr. Roberts was

13  recording his children in the nude as a form of child

14  pornography.  That is defamation *per se*.

15         THE COURT:  All right.  Do you want to speak

16  to your motions?

17         MR. WAYNE:  Yes, Your Honor.

18         Your Honor should grant Mr. Roberts' summary

19  judgment on Mr. Thomas' two remaining claims for four

20  reasons.  First, there's no dispute as to any material

21  fact.  Second, there is no competent evidence that

22  could satisfy Mr. Thomas' *prima facie* burden under the

23  Virginia Hate Crimes Act or the Virginia Stalking Act.

24         It's not just this case.  He's had ample

25  opportunity to develop such evidence.  There was also

the Loudoun County protective order hearing, a daylong

evidentiary hearing involving precisely the same issues

as Your Honor is considering now.  They had two bites.

Mr. Thomas has had two bites at the apple and has no

evidence whatsoever.

Moreover, the evidence that he does point to,

this so-called evidence, is contradicted by every

single piece of documentary evidence on the same

subject.

Finally, Mr. Thomas has engaged in a pattern

of deception beginning in December 2015 and continuing

through today.

So with regard to the Virginia Hate Crimes

Act, as Your Honor knows, Mr. Thomas needs to prove

racially motivated intimidation or harassment or

violence or vandalism.

So taking the racial animus element first,

what do they point to?  The Panera meeting that Your

Honor is familiar with.  There's no evidence of racial

animus regardless of what Mr. Thomas or Mrs. Thomas may

say now.  Mr. Thomas' two e-mails to Mr. Roberts the

very next day show what happened at the Panera meeting

and that there was no racial animus.

In the first e-mail, Mr. Thomas says, quote,

My wife was a bit intimidated at the meeting.  She

1 thought it was going to be a meet and greet. I

2 explained to her that sometimes men get passionate with

3 regards to matters and to not make much of it, close

4 quote.

5         The second e-mail on the same day, quote,

6 Donna is good. She just thought it would be a meet and

7 greet and other wives would be there. She didn't know

8 it would be a Q&A. But no worries. All is good,

9 exclamation point, close quote.

10         The other evidence that they point to or the

11 big theme -- and this was addressed last week before

12 Your Honor in the attorneys' fees motion -- is the

13 objection to Mr. Thomas' planned commercial use but not

14 objecting to the prior owner, Mr. Pomata, who was

15 white.

16         So as I told Your Honor last week, Lot 3 has

17 an equestrian center on it. It's a grandfather use.

18 It's absolutely consistent with the 1997 protective

19 covenants. Everybody who bought since then knew that

20 that was something they had to live with.

21         But in the spring of 2015, eight months

22 before Mr. Thomas bought the property, Mr. Pomata, the

23 owner of Lot 4A, which is the lot that Mr. Thomas

24 eventually bought, was marketing that lot for

25 commercial use to a prospective buyer who wanted to

build a soccer facility, a prospective buyer who wanted
to build a golf academy that would also be an event
center, like a wedding venue.

All of the neighbors opposed those uses.  In
fact, our Exhibit 7, an April 2015 e-mail chain among
all the neighbors, Metzgers (phonetic), Berlin,
Casagrande, Roberts, Grady, and others, objected to
those very uses.  Exhibit 8 are the documents relating
to the proposed soccer facility, and Exhibit 9 are
documents relating to the proposed golf academy.

So in terms of racial animus, there's
absolutely no proof, none at the Panera meeting or
anything else and certainly not with regard to the
alleged disparate treatment of Mr. Thomas, vis-a-vis,
Mr. Pomata.

Now, what about conduct?  There's an
allegation that Mr. Roberts fired a gun, and Mr. Thomas
says that Mr. Roberts fired a gun 3 times over 18
months.  There was -- or I should say he heard gunfire
3 times over 18 months.  There's absolutely no evidence
it was Mr. Roberts firing a gun or, even if he did, he
did so with the purpose of intimidation or violence.
Mr. Thomas even testified on deposition -- and we've
attached this to our brief -- that it could have been
someone else firing the gun, not Mr. Roberts.  Of

course, as Your Honor has heard, firing a gun in this
neighborhood is entirely lawful under the Loudoun
County ordinances.

The other conduct, tailgating. This notion
that Mr. Roberts tailgated Mr. Thomas in a threatening
way is contradicted by Mr. Thomas' own video which is
Plaintiff's Exhibit 15. Even if it is Mr. and
Mrs. Roberts in the car behind Mr. Thomas, who is
recording it over his shoulder as he's driving down the
road, it shows the car to be a reasonable legal
distance behind Mr. Thomas.

Now, the video that they point to, in May
2016 -- and this is undisputed -- Mr. Thomas trespassed
onto Mr. Roberts property and cut down two acres of
trees. Mr. Thomas' own e-mail confirms that.
Mr. Roberts, in response to this trespass, had called
the sheriff.

Shortly thereafter, Mr. Thomas constructs a
fence between the two properties, and it is being
painted. The painters are on Mr. Roberts' side of the
fence. He asked them who told them this was all right
to do it. If Your Honor has watched the video or at
least read the transcript in our brief, he said, you
know, Who asked you to do this? He said, Was it the
owner? The person Mr. Roberts was talking to had

limited English.  He says, Was it the black guy?  And
then he said in Spanish, El negro?  That's it.

In fact, there's a case on point with regard
to such a comment which plaintiff cites which says if
you're going to use such a term and it's descriptive
and not pejorative, it doesn't show racial animus.
That's exactly what we have here.

The surveillance camera I've covered, and
that in sum is all of the conduct that plaintiff points
to, not just with regard to the Virginia Hate Crimes
Act but also with regard to the stalking claim.  With
regard to the stalking claim, you have to show *prima
facie* evidence of conduct intended to place another in
reasonable fear of death or injury.  So the same
conduct that I just went through applies to that claim
as well.  There is no basis for Mr. Thomas to say that
he was reasonably fearful of anything.

In fact, Mr. Thomas' own testimony and the
evidence show, if anything, if in fact he is being
truthful, that he, in fact, is paranoid because he
accused Robert Milburn, a Loudoun County zoning
official, of sending a relative of his across state
lines to surveil Mr. Thomas.  Again, that's in our
brief, and all of it is supported by documentary
evidence.

1    So for all of those reasons, the stalking

2 claim and the Virginia hate crime claims should be

3 dismissed on summary judgment.

4    Now, with regard to my final point about the

5 pattern of deception, Mr. Thomas has argued

6 consistently in this case that the land use dispute has

7 no relevance, but at the motion to dismiss hearing --

8 in fact, we argued this.  In fact, this case, this

9 so-called civil rights case was an attempt to gain

10 leverage in the land use dispute.  Discovery has borne

11 this out.  Exhibit 27 is an e-mail chain to which

12 Mr. Thomas was added in late 2015 after he bought the

13 property.  In a January 2, 2016, e-mail, Mr. Thomas

14 says -- and the issue was the neighbors had heard that

15 he was going to build a winery.  In response to that,

16 Mr. Thomas says, Oh, those are rumors.  Wine making is

17 a, quote, hobby that I might pick up, unquote.

18    He did not disclose on that January 2, 2016,

19 e-mail that two weeks before, three days after he

20 closed on his property, he had requested and was sent

21 paperwork to schedule a pre-application conference with

22 the Loudoun County zoning staff.  The purpose of that

23 conference, which was held later in January, was to

24 build and operate a commercial winery.  So that never

25 happened after 40 or 50 neighbors strenuously opposed

1  the use of the property for that purpose.  That's one

2  example of the pattern of deception that stretches all

3  the way back to 2015.

4         Next Mr. Thomas created an entity called

5  Courtland Resort, LLC, which does business as Courtland

6  Resort.  Exhibits 22 and 23 are screenshots from the

7  website.  It's a center for events, weddings, retreats,

8  meetings.

9         Now, at the present time, as Your Honor has

10 heard, no commercial use is permitted on any of the 12

11 lots within this development by virtue of the temporary

12 injunction that's been entered by the Loudoun County

13 Circuit Court and also the fact that because the

14 homeowners' association was allowed to become defunct

15 that the county has said until a proper homeowners'

16 association is in place, the *status quo* will be

17 maintained.  So there's no commercial activity.

18         So at his deposition on May 24 of this year,

19 Mr. Thomas was asked about the website, the so-called

20 Courtland Resort website.  He was asked, Have you

21 received any calls attempting to make reservations at

22 this facility?

23         And he said, Yes.

24         What did you tell them?

25         I told them I wasn't taking reservations.

1          Why?

2          For the very reason I just said.  I told them

3     there's no commercial activity permitted at this time.

4          Exactly one month later Mr. Thomas rented the

5     property, Lot 4A, to a party promoter.  The

6     advertisement on Facebook is our Exhibit 71, which

7     makes reference to needing to purchase tickets to go to

8     this event.  They charged admission, and Exhibit 77

9     which includes the ad from Facebook, another version of

10    that ad from Facebook, $50 to get in the day of the

11    event.  The rest of Exhibit 77 is photographs that show

12    that this event included hundreds of people, a disc

13    jockey, alcohol, marijuana use, and strippers.

14         These photos are directly contrary to the

15    representations of Mr. Thomas' declaration under oath,

16    which is Plaintiff's Exhibit 22, where he says this was

17    a party for his family.  There was no marijuana use.

18    There was no alcohol.  Only iced tea and lemonade was

19    served.  He says that complaints of noise in the same

20    affidavit -- complaints of noise and marijuana smoking

21    were totally false and the product of racism.  These

22    assertions in the sworn declaration were quoted to the

23    Court by counsel last Friday and vouched for by her.

24    That's despite the fact that counsel did, in fact, have

25    a copy -- that's Exhibit 71 -- of that Facebook ad

1  which makes reference to the party, shows it's a

2  commercial event, talks about the need to buy tickets.

3       So as I say, the pattern of deception here

4  stretches from late 2015 through today.  Not only were

5  the neighbors deceived here, but in fact, by virtue of

6  Mr. Thomas' recent declaration, the Court as well has

7  been deceived.

8       Thank you.

9       THE COURT:  Counsel, I'll let you respond

10  both to reply on your motion and responding to the

11  defendants' motion.

12       MS. WATSON:  Yes, Your Honor.  I'll start

13  with the allegation of a pattern to deceive.  The

14  defendants' exhibit is not authenticated in any way.

15  It's a printout of some Facebook postings of the

16  photographs that counsel referenced.  They don't on

17  their face have any connection to the plaintiff or his

18  house.  Not to mention, it's outside of the fact

19  pattern of this case.

20       I would also posit that the January 2016

21  e-mail counsel referenced as demonstrating deception

22  that the plaintiff planned to meet with the county to

23  explore permitted uses of his property, that doesn't

24  show a pattern of deception.  He was exploring what he

25  could do with his property.  It doesn't refute what he

1  told his neighbors, that wine making was a hobby, and

2  that he wanted them to have their mind eased on that

3  point.

4         Now, with respect to the plaintiff's claims

5  in this case of racial harassment and stalking, the

6  record includes multiple witnesses who heard gunfire

7  coming from Raymond Roberts' property.  The defendant

8  believed it was coming from that direction.  Rose

9  Osamba did.  During the protective order hearing, three

10  additional witnesses said they heard gunfire coming

11  from that direction.  They also witnessed that Raymond

12  Roberts would be around Mr. Thomas' property taking

13  pictures, approaching the property, and also that --

14         THE COURT:  Isn't the evidence that he had a

15  shooting range on that property?

16         MS. WATSON:  That's right, Your Honor, but --

17         THE COURT:  There's no evidence that these

18  guns were pointed at him or his property in any

19  fashion?

20         MS. WATSON:  There's no evidence it was

21  pointed at him or his property.  However, the witnesses

22  testified that shortly after Mr. Thomas would arrive

23  home, gunfire began.  It's our position that a jury

24  could hear that within the context of all of this, and

25  that's something that we urge, that these actions are

not to be taken in a vacuum but in their whole and in the context of the whole.

There are also witnesses who saw Mr. Roberts following the plaintiff in his car, and the plaintiff testified that he was fearful of everything. Counsel mentioned that he felt paranoid, and his wife testified to that as well.

In addition, the evidence from the security camera shows it's pointed right at the plaintiff's property. You can see very clearly. Eventually, in June 2016, the plaintiff put up a board so that his house wasn't so visible.

The defendant has put forward an inconsistent explanation for this. He said the reason was that -- in his interrogatory answers, the reason was the clearing of the trees incident in May 2016, but that camera went up in February 2016. And you can't see where the trees were cleared. So a jury seeing that would conclude that the reason for that camera is to monitor the Thomas property, which is what it did.

Under the case that we cited, *Johnson v. Hugo's*, we think all of this taken together could be considered by a reasonable person to be intimidating and harassing.

There's also evidence that Raymond Roberts

was racially motivated. I won't leave -- explain it in

the papers, but when Pomata testified he got along well

with the neighbors -- notwithstanding that the

neighbors had issues with what he did with his

property, they got along well.

In addition, the video that counsel

referenced of Raymond Roberts approaching Cliff Thomas'

worker, that should go in front of a jury because what

that shows is Raymond Roberts doesn't go up to that

worker and say, This is my property. Can you please

leave? He says --

THE COURT: Well, he does say that.

MS. WATSON: Well, he says, Who told you you

can come on my property? Who told you that? The black

guy? El negro?

Then later in the video, it becomes evident

that maybe the trespass itself is not what upsets him

because he says, If you want to come on my property,

that's fine. That's fine.

So it's not even -- that makes it seem like

it's not the trespass itself he's so upset about, what

he's upset about is who told you you could do it? A

black guy?

A jury looking at that could infer and

understand that person to be motivated by animus

1  against the black guy.  So we think that creates a

2  triable issue of fact as to his motivation.

3           THE COURT:  All right.

4           MS. WATSON:  If I may, Your Honor, may I

5  respond to two things from counsel's argument regarding

6  our motion to dismiss very briefly?

7           THE COURT:  All right.

8           MS. WATSON:  I believe counsel in his

9  argument more or less acknowledged by saying that the

10 defamation *per se* claim is a flip side of one of the

11 dismissed claims in Mr. Thomas' complaint of child

12 pornography -- but as the record shows, Mr. Thomas

13 never said child pornography or any crime like that.

14 Using the complaint is subject to some judicial

15 privilege, absolute privilege.  So that cannot be the

16 basis of a defamation claim.

17          I would also reiterate that any maliciousness

18 evidence -- you know, the evidence is -- it's

19 undisputed that Mr. Thomas thinks Raymond Roberts is a

20 racist and he doesn't like him and he's been angry at

21 him.  Maliciousness in the context of defamation means

22 that he didn't have probable grounds for what he said

23 or that he actually believed them to be false.  The

24 defendant can't adduce evidence to support either of

25 those conclusions.

1        The camera was pointed at Mr. Thomas' house

2  24 hours a day.  You can see from the footage that it's

3  very clear.  His front yard is there.  You can see

4  there's -- you can see Mr. Thomas when he's on the

5  property putting up a board.  It's all very clear.  As

6  both he and his wife testified, their children were in

7  states of undress at times while on the property.

8        So I believe the available facts overcome any

9  kind of maliciousness finding.

10        THE COURT:  All right.

11        MS. WATSON:  Thank you.

12        THE COURT:  Thank you.

13        Mr. Wayne, I'll give you the last word on

14  your motion.

15        MR. WAYNE:  Thank you.

16        I would just like to address the point that

17  the photos of the invitation from the Facebook page and

18  the photos are, quote, not authenticated.  The

19  advertisement for the party has Mr. Thomas' address on

20  it, number one.  Number two, the photos contain photos

21  of the house at that address.

22        That's all I have.

23        THE COURT:  All right.  Thank you.

24        I've reviewed these motions, and I'm in a

25  position to rule on them.

1       There is before the Court cross-motions for

2  summary judgment.

3       First, Defendant/Counterclaim Plaintiff

4  Roberts moves for summary judgment on the plaintiff's

5  remaining claims for racial harassment and stalking and

6  on his counterclaim for defamation *per se*.  The

7  plaintiff moves for summary judgment on that

8  counterclaim for defamation and defamation *per se*.

9       In assessing whether either party is entitled

10  to summary judgment on his respective claims, the Court

11  is obligated to view the evidence most favorably to the

12  nonmoving party together with all reasonable

13  inferences.

14       Let me first address the plaintiff's stalking

15  and racial harassment claims.

16       In order to establish his claims for

17  stalking, the plaintiff is required to prove that,

18  first, the defendant directed his conduct toward the

19  plaintiff on at least two occasions; secondly, the

20  defendant intended to cause fear, knew that his conduct

21  would cause fear, or should have known that his conduct

22  would cause fear; and third, that the defendants'

23  conduct caused the plaintiff to experience reasonable

24  fear of death, criminal sexual assault, or bodily

25  injury.

1          In order to establish his claim for racial
2    harassment, the plaintiff is required to prove that he
3    was the subject of intimidation or harassment that was
4    motivated by racial animosity.

5          Here the plaintiff bases his claims on
6    evidence that Defendant Roberts fired guns on his
7    property when Thomas was present on his adjacent
8    property, has security cameras on his property that are
9    aimed at Thomas' property, and that Roberts has
10   tailgated Thomas on the road into their shared
11   cul-de-sac where Thomas and Roberts own adjoining
12   properties with gates right next to each other.  Thomas
13   also claims that Roberts falsely reported a trespass to
14   the sheriff; although, it is undisputed that the
15   trespass, in fact, occurred.  The only dispute is the
16   extent of the trespass.

17         With respect to these claims, the Court has
18   reviewed all of the evidence, including the videos that
19   the plaintiff has submitted that he claims evidences
20   harassment, racial animus, and an instance of
21   tailgating.  In that regard, the record is clear and
22   unequivocal that the entire dispute between these two
23   neighbors grows out of a dispute over the use plaintiff
24   intended to make of his property or is legally entitled
25   to make of his property.

1          The antagonisms between the parties obviously

2   has escalated over time and certainly do not reflect

3   well on either of them, but there's no evidence that

4   the defendants' positions and actions taken in

5   furtherance of his positions were based on race or

6   anything else other than the defendants' good faith

7   belief that the plaintiff had or was attempting to use

8   his property in an unauthorized or unlawful manner.

9          The tailgating video shows a car described as

10  Roberts a normal distance away from Thomas, who drove

11  and narrated.  The video does not show harassing or

12  intimidating conduct.

13         Similarly, the video recording evidencing

14  gunshots merely evidences sounds of guns that were

15  being fired in the neighborhood where the plots of land

16  are many, many acres.  The evidence, I think, is

17  undisputed that Roberts had a firing range on his

18  property lawfully.

19         There is no evidence that Thomas ever saw

20  Roberts fire a gun, and these actions cannot be

21  considered as harassing or intimidating conduct on the

22  part of Roberts towards Thomas.

23         There is no evidence in the record beyond

24  Thomas' mere assertions that the security cameras are

25  actually used to surveil Thomas and his family, rather

1    than to keep watch of Roberts' own property.

2              As to the stalking claim, none of Roberts'

3    actions could be construed to reasonably induce fear of

4    death or bodily injury.

5              Moreover, as to the racial harassment claim,

6    there has been no use of racial epithets on the part of

7    the defendant or any other evidence of race-based

8    animus as opposed to a land use dispute.

9              The video the plaintiff submitted involving

10   plaintiff's worker makes clear that Roberts used

11   Thomas' race or referenced Thomas' race only as a means

12   of identifying him after the workman was having

13   difficulty identifying who had authorized his presence

14   on his property and was not used in a racially charged

15   manner.

16             Additionally, there is no other basis from

17   which to infer a racial motivation for any of the

18   defendants' actions.  There's also insufficient

19   evidence to establish or even suggest that Roberts sat

20   back and allowed the previous white owner to conduct

21   commercial activities.  In fact, Roberts did not move

22   into his home until a couple of months before Thomas

23   purchased his.  The evidence indicates that Roberts

24   consistently and indiscriminately resisted commercial

25   activities, not that he treated Thomas any differently.

1    The specific conduct relied on does not
2 separately or collectively prove sufficient as a matter
3 of law to provide evidence of stalking or racial
4 harassment, nor can there be any reasonable inferences
5 from the specific acts plaintiff has identified that
6 could sufficiently establish either stalking or racial
7 harassment.

8    Based on all the evidence viewed most
9 favorably to the plaintiff, the Court finds and
10 concludes that the evidence is insufficient as a matter
11 of law for any reasonable jury to find that plaintiff
12 has established the elements of either claim and that
13 the defendant is entitled to judgment as a matter of
14 law on both the stalking claim and the racial
15 harassment claim.

16    With respect to the defendants' counterclaim
17 for defamation, the Court has reviewed that claim and
18 the evidence, as well as the *jurisprudential*
19 intricacies of defamation law in Virginia.  Under
20 Virginia law, the elements of defamation are
21 publication of an actionable statement with the
22 requisite intent.  An actionable statement is both
23 false and defamatory.

24    Accordingly, as a threshold matter, if the
25 statements at issue are either not defamatory or are

1 objectively true or protected expressions of opinion,

2 no actionable defamation exists.  Whether a statement

3 is an actionable statement of fact or nonactionable

4 opinion is a matter of law to be decided by the Court.

5          If a statement is not opinion, the plaintiff

6 in a defamation action has the burden of proving that

7 the statement is false.  Whether a plaintiff has

8 sufficiently proven the falsity of the alleged

9 defamatory statement is a jury question.

10          With respect to the fact or opinion issue,

11 under Virginia law, statements of opinion are generally

12 not actionable because the statements cannot be

13 objectively characterized as true or false.

14 Accordingly, speech which does not contain a provably

15 false factual connotation or statements which cannot

16 reasonably be interpreted as stating actual facts about

17 a person cannot form the basis of a common-law

18 defamation action.  Statements that are relative in

19 nature and depend largely upon the speaker's viewpoint

20 are expressions of opinion.  Nevertheless, factual

21 statements made in support of an opinion can be

22 defamatory.

23          In determining whether a statement is one of

24 fact or opinion, a court may not isolate one portion of

25 the statement at issue from another portion of the

1  statement.  Rather, a court must consider the statement

2  as a whole.

3         Moreover, the rule that opinions are

4  unactionable derives from federal law.  Here the

5  federal standard also applies to the extent that it's

6  more protective of speech than Virginia's standard.  In

7  that regard, the Fourth Circuit has noted that a trial

8  judge should consider the author's or speaker's choice

9  of words and decide whether the challenged statement is

10 capable of being objectively characterized as true or

11 false, examine the context of the challenged statement

12 within the writing or speech as a whole, and consider

13 the broader social context into which the statement

14 fits.

15        The verifiability of the statement in

16 question is a minimum threshold issue.  So that even if

17 a statement could be verified, it would not be

18 actionable if it is clear from any of the three

19 remaining factors individually or in conjunction that a

20 reasonable reader or listener would recognize its

21 weakly substantiated or subjective character as opinion

22 and discount it accordingly.

23        Statements can be defamatory *per se*, that is

24 they can impute to a person the commission of some

25 crime or criminal offense involving moral turpitude for

which the party, if a charge is true, may be indicted
and punished.  In addition, a defamatory charge need
not be made in direct terms; rather, it may be made by
inference, implication, or insinuation.  However, the
meaning of the alleged defamatory charge cannot, by
innuendo, be extended beyond its ordinary and common
accepted meaning.

The statement need not be sufficient within
itself to establish all the elements of the offense
imputed so long as unaided by innuendo but assisted by
the reasonable inferences to be drawn from the words
used, while not charging a criminal offense in express
terms, nevertheless imputes to the plaintiff the
commission of the offense.  The trial judge, not the
finder of fact, must determine whether a statement is
defamatory *per se* because it imputes the commission of
a crime involving moral turpitude.

The critical consequence of finding that a
statement is defamatory *per se* is that it relieves the
plaintiff of establishing as a prerequisite to recovery
special damages, which include pecuniary loss,
emotional upset, and embarrassment; whereas, in cases
involving a defamatory statement that is not defamatory
*per se*, special damages must be shown as a prerequisite
for recovery.

1          Where a statement is not defamatory *per se*,

2     the Virginia Supreme Court has described the standard

3     of defamation as follows:

4          Defamatory words are those tending so to harm

5     the reputation of another as to lower him in the

6     estimation of the community or to deter third persons

7     from associating or dealing with him.  A false

8     statement must have the requisite defamatory sting to

9     one's reputation.  Characterizing the level of harm to

10    one's reputation required for defamatory sting, the

11    Supreme Court has stated that defamatory language tends

12    to injure one's reputation in the common estimation of

13    mankind, to throw contumely, shame, or disgrace upon

14    him, or which tends to hold him up to scorn, ridicule,

15    or contempt, or which is calculated to render him

16    infamous, odious, or ridiculous.

17         If the Court determines that the statement is

18    not defamatory *per se*, then it must decide whether the

19    alleged statements are sufficiently defamatory on their

20    face to permit a fact finder to decide whether, in

21    fact, the statements were actually defamatory.

22         Under Virginia law, elements of intent also

23    bear on a plaintiff's ability to recover for

24    defamation.  A private plaintiff may recover actual,

25    compensatory damages where the defendant published the

statement knowing that it was false, or, believing it
to be true, lacked reasonable grounds for such belief,
or acted negligently in failing to ascertain the facts
on which the publication was based.  The application of
this negligence standard is expressly limited, however,
to circumstances where the defamatory statement makes
substantial danger to reputation apparent.  The trial
judge shall make such a determination as a matter of
law.  If, on the other hand, no substantial danger to
reputation is apparent from the statement in issue,
then under Virginia law, actual malice under the *New
York Times v. Sullivan* standard must be established to
recover compensatory damages.

However, even if the plaintiff is a private
citizen, the principle of qualified privilege protects
a communication from allegations of defamation if it is
made in good faith to and by persons who have
corresponding duties or interests in the subject of the
communication.

For example, a citizen has the right to make
a citizen's complaint about a police officer's
misconduct, and such a complaint is qualifiedly
privileged if made to a person having authority to
afford redress.

Even where there is a qualified privilege, it

can be defeated by a plaintiff's clear and convincing

showing of common-law malice, which can be accomplished

by any of the following:

First, the statements were made with

knowledge that they were false or with reckless

disregard for their truth;

Second, the statements were communicated to

third parties who have no duty or interest in the

subject matter;

Third, the statements were motivated by

personal spite or ill will;

Fourth, the statements included strong or

violent language disproportionate to the occasion; or

Fifth, the statements were not made in good

faith.

The question whether a communication is

privileged is a matter of law for the court, but the

question of malice is one of fact for the jury.

Based on those principles of law, the Court

has reviewed each of the statements that Roberts has

claimed is defamatory which appear in six e-mails.

The first e-mail is an e-mail dated May 25,

2016, to one of Thomas' contractors copying a friend

and sometimes business associate and also a Loudoun

County zoning official in which he refers to Roberts,

among other things, as a jackass and a cowardly racist bastard from Canada.

The Court concludes that these statements within the context made are emotional rantings and generic insults that constitute unactionable opinion without any stated factual basis that may be proven or unproven.

In that regard, the Court adopts the reasoning of the Seventh Circuit in *Stevens v. Tillman*, 855 F.2d 394, Seventh Circuit, 1988, in which the court provides an extended discussion and analysis of why the use of the term "racist" by the president of a PTA against an elementary school principal was not defamatory under Illinois law and the First Amendment. The core of that view is that the bare assertion of racism was not tethered to any facts.

In *Fleming v. Moore*, 275 S.E.2d 632, a 1981 Supreme Court of Virginia case, the Supreme Court of Virginia considered whether it was defamatory *per se* to accuse a UVA professor turned real estate developer of racism because the defendant charged the plaintiff with not wanting blacks to reside within sight of his home, a specific allegation of racism. Because the charge did not directly affect his reputation or his work as a UVA professor, the court ruled that it was not

defamatory *per se* and remanded it to the trial court,
presumably to consider whether it was sufficiently fact
based to constitute defamation under the looser
standard.

The dissent in that case opined that the
charge of racism is so widely and loosely used in
today's society that simply calling someone a racist
cannot be defamatory as it no longer has a commonly
understood meaning. This view coincides with the
Seventh Circuit's view that accusations of racism are
no longer obviously and naturally harmful and that the
word has been watered down by overuse, becoming common
coin in political discourse.

This particular analysis also applies to
Thomas' August 10, 2016, e-mail to Roberts' attorney in
which he stated that, I know all about you people and
have allowed a lot of harassment from you bigots.

Even assuming this statement could be
construed as referring to Roberts as well, this bare
accusation is not actionable.

With respect to the second e-mail which is
dated July 22, 2016, to Rose Ann Osamba, whom I
understand was trained as a lawyer but was not licensed
as a lawyer but is a friend and sometimes a business
associate, to two of his lawyers, and to a friend who

is also an attorney in which he, again, vented about
them not pursuing the attorney's representation in
which he said, among other things, If I was filming a
white person's kid and had nude photos of them, you and
the rest of the county would have me locked up by now.

Here, given the context of the recipients,
which are Thomas' lawyers and friends, the factual
assertion in this statement is, at most, that Roberts'
security camera captured nude pictures of Thomas'
children, not that Roberts was engaging in child
pornography. The balance of the e-mail likewise makes
clear that Thomas' concern or belief is that Roberts'
camera was capable of picking up pictures or videos of
his children nude in the yard and those that received
this statement in the context of the entire e-mail
would not naturally and presumably think that Thomas
was accusing Roberts of creating child pornography.

There is an implication that what Roberts was
doing is illegal, but it is couched in hypothetical
language, that is, if Roberts' camera captured his
children changing or urinating, it would be illegal.
The meaning of the alleged defamatory charge cannot, by
innuendo, be extended beyond its ordinary and common
meaning.

For these reasons, the Court concludes that

this is e-mail is insufficient to sustain a charge of

defamation *per se*.

Nevertheless, with respect to whether it can

otherwise be seen as defamatory, the Court must

consider whether this statement is reasonably capable

of harming Roberts' reputation with the requisite sting

such as to hold him up to scorn, ridicule, or contempt.

The Court concludes on that issue that it is sufficient

to create a jury issue as to whether the statement was

defamatory and false.

Nevertheless, because any recovery would be

for a statement that is not defamatory *per se*, Roberts

is also required to show special damages as a

prerequisite to recovery in non-*per se* cases.  Given

that this statement was only made to Thomas' lawyers

and his close friends and business partners, presumably

he understood the entire factual scenario in which the

comment was made.

The Court concludes as a matter of law that

Roberts cannot prove any special damages as to the

statement, that is damages based on a tangible

pecuniary, emotional, or embarrassing effect on him or

his reputation based on this e-mail.  There is no

evidence concerning what effect it had on any of the

recipients or anyone else.

1          With respect to e-mail Number 3,

2     September 22, 2016, the e-mail to a staff aide, the

3     chair of the Board of Supervisors of Loudoun County,

4     which included in its history a September 19, 2016,

5     e-mail that Thomas had sent to his attorneys in which

6     he said, You would not file a criminal complaint when I

7     advised you that Raymond Roberts tried to intimidate me

8     by shooting off his high-powered rifle when he knew I

9     was at the property or the fact that he has nude

10    pictures of my underage children on his camera coming

11    into my yard or the fact that he tailgated me on Laurel

12    Wood Court in an effort to intimidate me.

13         Here the factual basis as stated for Thomas'

14    belief that Roberts' conduct constituted a crime for

15    which the criminal complaint should issue.  He falls

16    short, however, of accusing Roberts of committing an

17    offense of child pornography or pedophilia.  Therefore,

18    it is not defamatory *per se*.  Nevertheless, this

19    statement is reasonably capable of sufficiently harming

20    Roberts' reputation and holding him up to scorn,

21    ridicule, or contempt.  It is, therefore, a jury issue

22    as to whether it was defamatory and whether it is

23    false.

24         The Court likewise concludes that the content

25    of the e-mail and the recipients are such that the

1 Court cannot rule as a matter of law that Roberts
2 cannot establish any special damages with respect to
3 damage to his reputation.  As a matter of law, there is
4 sufficient danger to Roberts' reputation with these
5 public officials and the others e-mailed that appears
6 in the circumstances of this statement since it is made
7 to an aide to the chair of the county supervisors, who
8 would necessarily need to communicate it to others in
9 the county government given its nature, as the purpose
10 of Thomas' e-mail is to request a meeting with her
11 boss, an elected official.

12      Because of the recipients and because Thomas'
13 statements concerned and was in the context of a
14 dispute between neighbors and made to a public official
15 who had a corresponding duty or interest in the dispute
16 between neighbors and his motive included getting the
17 county to take action on his situation, any defamatory
18 content in this statement is entitled to a qualified
19 privilege which requires a clear and convincing showing
20 of malice to overcome, together with the showing
21 required in any event that Thomas published the
22 statement knowing it was false, or, believing it to be
23 true, lacked reasonable grounds for such belief, or
24 acted negligently in failing to ascertain the facts on
25 which the publication was based.

1          Accordingly, it's for the jury to decide

2    whether the statements in this e-mail were defamatory,

3    false, or whether Thomas published it with the

4    requisite intent.

5          With respect to e-mail Number 4, an

6    October 6, 2016, e-mail to two assistant Loudoun County

7    attorneys, the county attorney, the chair of the Board

8    of Supervisors of Loudoun County, the supervisor, and

9    two staff aides to the county supervisor in which

10   Thomas included in its history the other e-mails just

11   discussed dated December 22, the same analysis applies

12   to this e-mail as well.  It's a jury issue as to

13   whether they were defamatory, false, and whether he

14   published it with a requisite intent.

15          With respect to e-mail Number 5, which is an

16   October 29, 2016, e-mail, again, to the county

17   officials and also the Loudoun County sheriff, in that

18   e-mail, he has stated, among other things, We believe

19   Mr. Roberts may be using his camera to peep in our

20   bedroom window.  It is also probable that Roberts has

21   nude photos of my children on his camera.  Please send

22   the sheriff to his house to advise him he cannot be

23   using his camera to peep in to my house or to obtain

24   pornography.  I am seeking efforts through a federal

25   channel to obtain a subpoena of the camera.  If nude

1  photos of my children are found on this camera,

2  criminal charges will be filed.

3          Here, whether Thomas' statements constitute

4  defamation *per se* is a close call.  He uses the word

5  "pornography," arguably referencing the probable nude

6  photos of his children, and explicitly states that

7  criminal charges will be filed if he finds evidence of

8  this.  Nevertheless, he did not, in fact, say Roberts

9  engaged in child pornography.  The question is whether

10 this is reasonably insinuated or implied in his e-mail.

11         As the Supreme Court of Virginia stated in

12 the *Schnupp v. Smith* case, which is 457 S.E.2d 42, a

13 1995 case, a defamatory *per se* statement must impute a

14 crime unaided by innuendo but assisted by the

15 reasonable inferences to be drawn from the words used.

16         Given the context and the surrounding words

17 and accusations, the statement is capable of

18 insinuating that Roberts probably engaged in child

19 pornography.  But that is such an outlandish claim,

20 based only on Roberts having security cameras pointed

21 at Thomas' property, and one the Court itself, based on

22 the pleadings, found to be frivolous, it is difficult

23 to see how a reasonable person could take him to be

24 alleging the crime of child pornography.

25         Again, given the recipients and the context

1    of this e-mail, the Court concludes that the statement
2    is entitled to qualified immunity.  Therefore, the
3    Court concludes, based on the context and substance of
4    the e-mail, that it is not defamatory *per se* but is
5    sufficient to have submitted to the jury to decide
6    whether the statements in this e-mail were defamatory,
7    false, and whether Thomas published it with a requisite
8    intent.

9            The same analysis applies to the October 29,
10   2016, e-mail to the president of the Loudoun County
11   NAACP in which the previous e-mail was included in the
12   history, except that this e-mail is not entitled to a
13   qualified privilege.

14           In sum, the Court concludes that the evidence
15   is sufficient for Roberts' defamation claim to be
16   submitted to the jury as outlined in this ruling.
17   Accordingly, the defendants' motion for summary
18   judgment is granted in part and denied in part.

19           It is granted as to plaintiff's claims for
20   racial harassment and stalking under Virginia law and
21   is denied insofar as it seeks summary judgment -- that
22   Thomas' statements were defamatory *per se* in his
23   counterclaim.

24           The plaintiff's motion for summary judgment
25   is also granted in part, denied in part.  It is granted

1    as to Roberts' claim that the statements in his e-mails

2    were defamatory *per se* and to the extent Roberts'

3    defamation claim is based on statements other than

4    those that the Court found actionable.  The motion for

5    summary judgment is otherwise denied.

6         The Court will issue an order.

7         All right.  Is there anything further?

8         (No response.)

9              THE COURT:  Have either of you scheduled your

10   settlement meeting with the magistrate judge?

11             MR. WAYNE:  Not yet, Your Honor.

12             THE COURT:  I am going to direct you to do

13   that immediately.

14             I would also just make the observation that

15   counsel could have provided a little service to their

16   clients in this kind of a case in assisting them in

17   attempting to resolve this matter.

18             MR. WAYNE:  Yes, Your Honor.

19             MS. WATSON:  Yes, Your Honor.

20             THE COURT:  All right.  Counsel are excused.

21             The Court is going to take a brief recess
     before it continues the civil docket.
22             -----------------------------------
                        Time:  12:07 p.m.
23
          I certify that the foregoing is a true and
24    accurate transcription of my stenographic notes.
                                    /s/
25                         Rhonda F. Montgomery, CCR, RPR


          R h o n d a   F.   M o n t g o m e r y   OCR-USDC/EDVA   ( 7 0 3 )   2 9 9 - 4 5 9 9